STATE OF NEBRASKA, APPELLEE, V. DENNIS RYAN, APPELLANT.

409 N.W.2d 579

Filed July 24, 1987.    No. 86-477.

Rodney J. Rehm of Rehm & Bartling, and, on brief, Victor Faesser, for appellant.

Robert M. Spire, Attorney General, and Susan M. Ugai, for appellee.

Krivosha, C.J., Boslaugh, White, Hastings, Caporale, Shanahan, and Grant, JJ.

Boslaugh, J.

The defendant, Dennis Ryan, was charged with first degree murder in the torture death of James Thimm. Thimm died on or about April 30, 1985, as the result of being physically abused for several days before his death.

The defendant's father, Michael Ryan, who will be referred to as Ryan, was the leader of a group or cult that was living on a farm near Rulo in Richardson County, Nebraska. The defendant and Thimm were members of the group, but Thimm had fallen out of favor and had been demoted to the status of a "slave." Ryan decided that Thimm should be tortured and then killed, and directed the men living at the farm, including the defendant, in the abuse of Thimm.

The information against the defendant was filed on September 18, 1985. At his arraignment on October 8, 1985, he pleaded not guilty. A motion to waive jurisdiction to the juvenile court was filed on November 27, 1985, together with a notice of intent to rely upon the defenses of insanity or diminished capacity.

The motion to waive jurisdiction to the juvenile court was overruled on December 18, 1985. On the same day the defendant's case was consolidated with the cases of the defendant's father and Timothy Haverkamp and a change of venue granted to Douglas County, Nebraska.

Jury selection commenced February 24, 1986; trial began March 10 and was concluded on April 10. The jury returned a verdict of guilty of second degree murder, and the defendant was sentenced to life imprisonment.

On appeal the defendant has set forth seven assignments of error on six issues. The defendant contends the trial court erred in failing to grant his motion to waive jurisdiction to the juvenile court, in receiving into evidence various photographs, in excluding certain testimony, in sustaining his codefendant's objections to the introduction of two depositions, in refusing to give certain requested jury instructions, and by imposing an excessive sentence.

The defendant first contends the trial court erred in refusing to grant his motion to waive jurisdiction to the juvenile court. It is his position the evidence presented at the transfer hearing does not support the court's findings and order denying the transfer. The State contends the district court properly denied the defendant's motion because the statutorily required balancing test by which public protection is weighed against the practical and probable rehabilitation of the defendant mandated retention by the district court.

The defendant was born August 31, 1969. On the date of the offense he was 15 years and 8 months old. His parents removed him from school after he had completed the eighth grade at Holton, Kansas.

At the hearing on the motion to waive jurisdiction to the juvenile court, the State introduced evidence concerning the torture of James Thimm and the defendant's participation in it.

The men who lived at the farm near Rulo, in addition to Ryan, James Thimm, and the defendant, included John David Andreas, James Haverkamp, Timothy Haverkamp, and Richard Stice. There were also a number of women and children. The women included Ruth Ryan, the wife of Michael Ryan and the mother of the defendant, Cheryl Gibson, Lisa Haverkamp, and Maxine Haverkamp. The children included Luke Stice, the 5-year-old son of Rick Stice, who also was tortured and killed at the direction of Ryan.

Andreas testified he had resided in Beatrice, Nebraska, for 19 years, and had moved to the Rulo farm in August 1984 because Ryan had told him that God wanted Andreas to move there. Andreas had known James Thimm for 7 or 8 years prior to his move to the Rulo farm. Thimm, who was approximately 25 or 26 at that time, was already living on the farm when Andreas moved there. Andreas testified he met Ryan in the latter part of 1982, a few days after a meeting near Hiawatha, Kansas, where a group of people were discussing different ways to defend themselves in the event of a breakdown of law and order and a Soviet attack. A few weeks later they met again at Ryan's home in Whiting, Kansas, and discussed the problems of the country and the activities occurring which were contrary to the words of the Bible.

Andreas continued to work at his job through 1983 and part of 1984, and the three men continued to get together. At some point, either in December of 1982 or January of 1983, Ryan said he could speak to God, and God would answer yes or no. Ryan and his brother-in-law had said they could talk to God and "they'd use one of their arm — right arm and they'd ask a question, and if the arm was strong, it was a yes, and if it was — the arm was weak, then it was a no." Andreas testified that "If the person that is holding the arm up would resist and the other person would press on the arm and try to force it down, and if it would stay up, or you could tell the difference in the strength, then it would be a yes." Andreas believed Ryan could talk to God during the period of early 1983 through August 1984, and had possibly seen Ryan use the defendant's arm to talk to God during that time. During the summer of 1983 Ryan told Andreas he could ask God whether or not people were "in deep trouble with God, and he even went as far as to say that you were in a condition where you would burn in hell if you didn't change . . . ." Ryan referred to God as "Yahweh." During that period Andreas participated in various thefts because Ryan said God wanted them to do so. Andreas stated he had equated their situation with being at war and taking from your enemies. The defendant did not participate in these thefts, but helped unload stolen property and was present when the thefts were discussed.

When Ryan told Andreas he should move to the farm and live with the group, Andreas stopped working in Beatrice. When Andreas moved to the farm, Cheryl Gibson and her children, Ryan and his family, James Thimm, Rick Stice and his three children, and James Haverkamp and his sister Lisa were already there. Andreas testified that once on the farm he and the other men, including the defendant, each had rifles.

A sort of military rank was imposed wherein the defendant began as a corporal and eventually was promoted to the rank of general. Andreas testified that at some point Ryan began to talk to God through his mind and that God told Ryan what everyone's rank should be.

Andreas testified he stayed on the farm from August 1984 until June 25, 1985, when he was arrested. He stated the defendant was promoted because, according to Ryan, the

defendant "had more faith in God than any of the rest of us did and that he did everything he was told without question or didn't have any bad thoughts in his mind." The defendant seemed proud of his promotions and was very enthusiastic. Andreas initially was given the rank of private but eventually was promoted to general. Ryan called himself the king. The defendant was called a prince and Tim Haverkamp a high priest. Andreas testified that a watch was kept on the road to see if anyone was coming from approximately 6 a.m. to about 10 p.m. every day. The watch was to look for law enforcement people, and, although the guard was armed, they were instructed to radio Ryan rather than use the weapons. Andreas testified the defendant did some guard duty and was treated like the other men. Although all of the men, other than Ryan, were eventually promoted to general, the defendant had authority over the other men, including James Haverkamp, Andreas, James Thimm, Tim Haverkamp, and Rick Stice. The defendant had authority to tell the others to do certain activities and relayed messages to them from Ryan.

Andreas testified in detail about Thimm's death. Thimm had been given the status of slave after the first of the year in 1984 and was living in a separate trailer because Ryan said he was in big trouble with God and was going to burn in hell. Ryan had told them Thimm had been demoted to slave because he had denied God and had bad thoughts. Additionally, there had been a message from God that Thimm had poisoned a wild turkey which had been shot and was to be used for the feast to celebrate the birth of Lisa Haverkamp's child. That incident was the final occurrence which resulted in Thimm's demotion. About 1 month prior to his death he was chained up at night and forced to sleep on the porch of the south trailer house. Thimm was chained at night by the defendant, or one of the others, or himself. Thimm did not resist this treatment in any manner. The chain was padlocked to his ankle, or around his waist or stomach, and attached to a post. Andreas testified Thimm was chained at night because "Mike said that God had told him that he might run off, or just that God had said that that's what was supposed to be done to James Thimm because he was having bad thoughts." During the day Thimm did activities around the

farm.

Andreas testified that in about the middle of March Thimm was shot through his left cheek by the defendant. Thimm was then fed cayenne pepper to control the bleeding and was bandaged by Ryan.

Andreas testified that Rick Stice was also demoted to slave after the first of the year in 1984. Andreas stated that the defendant and Tim Haverkamp lived in the south trailer, to which the porch in which Thimm lived was attached.

Two days before his death Thimm was moved to the hog confinement building and was instructed by Ryan to take a goat with him and have sex with it. Thimm was given a jar for water, a hotplate, and a sleeping bag. The next day someone took a turtle to him for food. The day before Thimm died Ryan inserted a greased shovel handle into Thimm's rectum several times, then the defendant, Tim Haverkamp, James Haverkamp, and Andreas also did so. Thimm offered no resistance. Later that same day the same men whipped Thimm. At this time Thimm was spread-eagled against an auger. Each man was directed to inflict 15 lashes. Two whips were used, a bullwhip and a livestock whip. As a result of the whipping, Thimm's skin was reddened. The men then left Thimm in the confinement building, restrained.

The next day Thimm was whipped again, because the redness from the first day was gone. The same men were involved and again inflicted 15 lashes apiece. Ryan then directed each man to take one shot at one finger on one of Thimm's hands. Andreas and Haverkamp then prepared to disk the field, and Ryan told Andreas to come into the building and say goodbye to "your good friend." At that time Thimm was alive and coherent, but unclothed. The defendant, Ryan, and Tim Haverkamp were in the confinement building. A short time later Andreas looked into the building and saw that Thimm's thighs were broken, and, he testified, it was the last time that he saw Thimm alive. Ryan later told Andreas that Thimm was dead and they would bury him that evening.

Later that evening Andreas saw Thimm's body on the sleeping bag, saw that his legs were broken, and saw that he had been skinned on one leg. The body was also more bruised than it

had been the last time Andreas had seen it. Andreas testified the defendant "thought it was kind of — it was kind of neat that he had helped kill somebody." Tim Haverkamp, the defendant, and Andreas dug the grave in the field that had been disked. Thimm was placed in the grave, and Ryan directed Haverkamp to shoot Thimm's head. Prior to that time Andreas had seen no signs of life in Thimm.

Andreas testified the defendant had later bragged about the killing and did not show remorse or sorrow.

On cross-examination Andreas testified that during the time he resided at the Rulo farm he believed that Ryan could talk to Yahweh. Andreas also testified Ryan did not threaten him with bodily harm when he directed Andreas and the others to torture Thimm, but told them God would be pleased if they did so. He testified he believed that that was what God wanted and he did not want to displease God. He testified that when he participated in the murder of James Thimm he thought that he was doing the right thing.

The defendant's counsel and Andreas illustrated how Ryan used the arm test to determine Yahweh's will. The attorney raised his arm at about a 45-degree angle toward the witness; Andreas stated a question would then be asked and he would try to pull down on the arm. If the arm fell down the answer would be no. If the arm was strong the answer would be yes. Andreas stated he thought he could talk to God in that manner until about 30 days after his arrest. He also testified he had thought Ryan could read minds, so he worried about having "wrong thoughts." He testified that during his residence at the Rulo farm he was not in touch with reality, stating, "There was very little reality that was out there. It was a fantasy world." He testified Ryan had told them that anything he said was the same as if it was written in the Bible. He stated he was fearful at that time that if he displeased Yahweh he would be condemned to burn in hell. Andreas testified Ryan had told them he could "deteriorate someone else's brain," and that he saw the results of what Ryan had done with Luke Stice and James Thimm. He stated he believed Thimm's brain had been deeply affected. Andreas stated Thimm complained very little of his torture, and throughout the ordeal begged Yahweh for forgiveness.

Andreas testified he was told the defendant had accidentally shot Thimm in the cheek; Yahweh had somehow pulled the trigger and caused the gun to fire.

Andreas testified that he was more concerned with Thimm's afterlife, that he would burn in hell, than with his suffering in his physical life. He testified that while he lived on the Rulo farm, the defendant was obnoxious, acted like a mouthy boss' son, and was a messenger and alter ego for his father. He stated he never saw the defendant disobey an order from his father and that he "blindly" followed what Ryan said. Andreas testified the farm had belonged to Rick Stice, who was initially a high priest until he was demoted to slave.

Andreas testified that when Stice was demoted to slave Stice was directed to have sex with a goat. Andreas held the goat while Stice did so.

Ryan was absent from the farm one weekend during the time Thimm was treated as a slave, but Andreas did not free Thimm and take him to Beatrice because Andreas was afraid Ryan would hunt Andreas down and kill him because he had displeased God. Andreas had disked the field to prepare for the burial of Thimm's body. Andreas felt that he had been brainwashed by Ryan, and that is why he had not left the farm for help even though he had access to weapons and transportation. He did not realize that he had been brainwashed until 40 days after he had been separated from the Rulo farm.

It was stipulated that Andreas had entered into a plea bargain with Richardson County and the U.S. attorney, and several counties in Kansas and Missouri, wherein he agreed to plead to three felony counts, with a total maximum penalty of 30 years, in exchange for telling the truth about the occurrences on the Rulo farm.

Andreas testified the younger children on the farm received some schooling at the farm, but the defendant did not participate in it.

Terry Becker, an investigator with the State Patrol, also testified. Becker participated in several searches of the farm near Rulo, Nebraska. The first search was conducted on June 25, 1985, to find stolen property allegedly located on the

premises. The officers cut the lock on the gate and approached the residence. Inside the home Becker observed numerous people, including the defendant's mother. He observed a number of guns and a birthing chair, which Ryan said had been used to deliver Lisa Haverkamp's baby. Becker testified, "There was continuously a gun within reach anywhere in that trailer. There were guns — like fully automatic weapons above each bed in the living quarters. There was a weapon above each doorway. There were handguns on the tables. It was a heavily armed residence." All of the guns were loaded. During this time the defendant was yelling obscenities at the officer from the south trailer, where he was in the custody of other officers.

As a result of the search the officers seized 13 fully automatic AR-15 rifles and approximately $120,000 of merchandise. The property was later determined to have been stolen from counties in Missouri, Nebraska, and Kansas. At the beginning of the search the defendant did not have a weapon on his person but was near a bed which had fully loaded automatic weapons on it.

A second search was conducted on the morning of August 17, 1985, because Rick Stice, a former resident of the farm, reported his son had been killed, and there was concern over the whereabouts of James Thimm. Stice had informed the officer that Thimm had previously been shot through the cheek by the defendant. That same day Ryan and Tim Haverkamp were arrested by the sheriff. On that day only one woman remained on the farm; the others had moved to Norton, Kansas, to the Lynn Thiele residence. More weapons and explosives were seized, as well as survivalist literature. In addition, the bodies of Luke Stice and James Thimm were discovered. The bodies were found after James Haverkamp told other officers that James Thimm had been killed and was buried in an unmarked grave with Luke Stice. The value of the property seized after this search was approximately $5,000, and included handguns, rifles, hand grenades, charcoal, and other chemicals for use in the manufacture of black powder. During this time the defendant was at the Lynn Thiele residence.

Becker testified that when he went there, with a search warrant, and attempted to obtain the weapon which had been

used to shoot into Thimm's body at the gravesite, the defendant was in custody in Kansas by virtue of an arrest warrant issued by Richardson County, Nebraska. The officer interviewed the defendant regarding the bodies found at the Rulo farm. The defendant indicated he knew nothing about any bodies at Rulo. The defendant stated his father had given him the gun which was then retrieved from the Lynn Thiele residence.

Becker testified the defendant had no juvenile record in any jurisdiction.

The State then rested.

The defendant presented testimony by two other men charged in the murder of James Thimm, a psychologist, a woman who works with cult members, and several attorneys.

James Haverkamp, one of the other men charged, testified that he moved to the Rulo farm in June or July 1984 because he then believed Ryan could speak with God and had instructed Haverkamp to move there. He had believed Ryan could talk to God for approximately a year prior to his move. Ryan sometimes spoke to God through Haverkamp's right arm. Haverkamp believed he was an Israelite, a descendant of Abraham, and that his belief was founded in different Bibles and Bible dictionaries. He began to believe he was an Israelite in the spring of 1983 and believed everyone who lived on the Rulo farm was an Israelite, including Luke Stice, until he was told in the spring of 1985 that the Stice boy was not. At that time Haverkamp was told that young Stice was a mongrel, and the boy was punished. The numbers 666 were written on the boy in red ink, and he was not allowed to wear clothes other than underpants for the last 2 months of his life.

Haverkamp testified he did not object to the boy's treatment because he was afraid of being punished and of burning in hell for questioning what God wanted.

Haverkamp testified that Ryan had directed him to probe James Thimm with the shovel handle because that was what Yahweh wanted. He had been told Yahweh wanted Thimm to feel pain because he had denied Yahweh. He believed he was doing God's will when he did so, and did not know how to justify how badly Thimm was hurt. Haverkamp participated in whipping Thimm and shot one of his fingers. Haverkamp

further testified he had participated in kicking Thimm. Haverkamp testified the defendant participated in the torture with the other men. The defendant was above him in rank, and Haverkamp had no say with regard to the defendant's activities. In the fall of 1984 he was told by Ryan that the defendant was considered a man in the eyes of God.

Haverkamp no longer believed he could talk to God through his arm and had stopped believing that about 40 days after he was separated from the Rulo farm by his arrest. His freedom to leave the farm was restricted, but he had not objected to such restrictions because he believed it was what God wanted. Haverkamp testified the defendant helped with the school on the farm on one or two occasions, and spent more time with the children than the other men.

Haverkamp believed he had been brainwashed, meaning he did things there he would not normally have done. For example, even though Haverkamp had previously been a hog farmer, as a member of the Rulo group he was forbidden to eat pork because it was "unclean."

Haverkamp was initially attracted to the Rulo group because of Yahweh and the fear of Armageddon. The men stole batteries, tractors with backhoes, guns, ammunition, and food to prepare for the battle they believed to be imminent. Toward the end of his stay at Rulo things were quite different than when they began.

Haverkamp testified he believed Ryan controlled his free will. When Thimm died he did not worry that he had committed a crime and did not get rid of the evidence. The shovel, for example, was still in the confinement building 4 months later.

Haverkamp testified that Ryan, Rick Stice, and the defendant had reported experiencing visions while at the farm. Haverkamp had not had visions nor heard voices, but Ryan, Stice, and the defendant had reported such experiences. Haverkamp testified he was told Ryan was married to his sisters, Cheryl Gibson and Lisa Haverkamp, and his mother, Maxine Haverkamp, in the eyes of Yahweh. Ryan was also legally married to Ruth Ryan, as far as Haverkamp knew. Haverkamp believed these marriages were what Yahweh wanted. He did not leave the farm for fear of burning in hell

because Ryan had told him that was what Yahweh would do to him. Ryan had announced on December 31, 1984, at a gathering at the farm that if anyone wanted to leave they should do so then because after the first of the year they would not be able to. They had to decide whether to follow Yahweh or go against him. There was an implication that if someone left they would have trouble in the hereafter.

Haverkamp testified he had never seen the defendant go against his father's wishes or question the existence of Yahweh. The defendant actively participated in the Bible discussions held on Saturdays.

Dr. James Cole, a professor of psychology at the University of Nebraska, testified regarding his psychological evaluation of the defendant. Cole had supervised a battery of psychological tests, including intelligence tests, given the defendant, as well as a psychological interview. Dr. Cole reviewed the results of those tests and a report from the State Patrol consisting of statements of Andreas and Haverkamp, and then interviewed the defendant a second time just prior to the hearing.

It was Dr. Cole's opinion that the defendant was functioning at an average or above average intellectual level, but that he appeared to be fairly immature, "particularly emotionally and in terms of general awareness of the world around him." The defendant's responses to the Rorschach test, in particular, tended to illustrate that his level of maturity was more in line with young people's than adults'. Dr. Cole also testified a portion of the defendant's responses showed "pretty good reality contact."

Dr. Cole testified the defendant was "very open and cooperative" during the October interview and had talked a lot about movies, particularly "Red Dawn" and "The Terminator."

Dr. Cole stated his definition of immaturity could be illustrated by the following "synonyms": "[A] kind of naivete, lack of sophistication, a lack of independence of judgment, acceptance of other people's in very absolute and total — other people's views as absolute and total. A lack of questioning of things." Dr. Cole believed the defendant was less independent than a typical 16-year-old. He further testified the defendant

unquestionably accepted the "values, the beliefs, the religion, of his father. . . . He believes in what his father believes in; he believes in the religion very strongly and uncritically." Dr. Cole viewed such uncritical acceptance as a sign of immaturity. Dr. Cole determined, based on the aforementioned testing, that the defendant's age in terms of maturity was that of a 12- to 13-year-old.

Dr. Cole illustrated his view of the defendant's immaturity by relating a question asked by the defendant with regard to "the gangs that wander around campus? . . . Where are they? Can you see them?" Dr. Cole also testified the defendant scored high on the "L" scale. He testified this was consistent with groups of people who tend to have strong and extreme religious views, not because they lie but because they "tend to have very strong absolute beliefs." Dr. Cole assumed the defendant's religious views were not significantly different from those at the time of the murder. That indicated to Dr. Cole the defendant was dominated by a "very strong, very absolute religious system that he believed in very strongly, still believes in very strongly" and that he is guided by "the words of Yahweh in his behavior, and he accepts that unquestionably." Dr. Cole stated the defendant believed it was Yahweh, rather than himself, who pulled the trigger and shot James Thimm in the cheek. The justification for this behavior was because Thimm had apparently denied Yahweh and this act would please Yahweh. Dr. Cole believed the defendant actually believed in the religious beliefs he professed.

Dr. Cole concluded the defendant "admires his father completely; he feels his father is a leader for Yahweh; he believes his father" had spoken at the farm because Yahweh had instructed him to do so. Dr. Cole further testified the defendant viewed his father as a martyr because he was subsequently betrayed by his followers. Dr. Cole viewed the defendant as totally committed to his father and stated that he showed no doubts as to his father's actions.

Dr. Cole testified the defendant seemed even more adamant about his religious beliefs at the more recent interview. At the second interview the defendant seemed to have more anxiety about the events. Dr. Cole testified the defendant had shared a

cell with his father in November and had been very distressed by it. He saw himself and his father as the only remaining believers and saw his whole world crumbling around him.

It was Dr. Cole's opinion that the defendant was "totally under the domination of his father" when he participated in Thimm's murder, and "was not acting on his own free will." Ryan was the single most important influence, but the whole group reinforced his orientation and the violence associated with it. Dr. Cole testified the participation of the adults had some influence on the defendant. It was his opinion the defendant would not benefit by being treated as an adult, but could be rehabilitated through participation in the juvenile system. Dr. Cole testified the success of such rehabilitation was contingent on the role in such a program played by his father. He testified it would be relatively easy for Ryan to undermine the defendant's rehabilitation.

Dr. Cole believed there was a chance the defendant could be rehabilitated if in an adult prison with his father, although he would be very vulnerable.

On cross-examination Dr. Cole testified that at the second interview, the Sunday prior to the hearing, the defendant still believed Yahweh speaks through his father. Dr. Cole had never before encountered a similar situation in his practice, and could only speculate about the length and type of treatment which would rehabilitate the defendant. He recommended placement, after counseling, in a carefully selected, healthy, religious home.

Dr. Cole stated that even if the defendant were separated physically from his father, it was doubtful whether he could be separated from his father's influence. For that reason Dr. Cole believed it was critical to obtain a commitment from his father to support rather than undermine a rehabilitation program. For the defendant to be rehabilitated required his father's support and the defendant to change his beliefs, but neither requirement had occurred. Dr. Cole stated that at his recent meeting with the defendant the latter was not even considering changing his religious beliefs.

Dr. Cole stated the defendant was reluctant to discuss his participation in Thimm's murder, tried to avoid talking too

much about his father, and did not show any remorse for what had happened. The defendant still believed that it was the will of Yahweh, and this belief was even stronger at the second interview. Dr. Cole testified that, for rehabilitation to succeed, the defendant would have to recognize the relationship between his religion and the inhuman behavior which resulted from it, and feel some remorse for his actions, but the defendant did not yet have those feelings. Dr. Cole testified that group membership often pulls people into activities they would normally never do, often macho behavior. In Rulo those pressures were present, plus the additional pressures of God and his father. Dr. Cole testified he was in favor of transferring the case to juvenile court to allow placement in a foster home, even though the placement period required might exceed the scope of the court's jurisdiction.

The defendant's next witness was Priscilla Coates, an executive director of the Citizens Freedom Foundation, a support group for former cult members. Coates testified she preferred the term "destructive group" to cult, and stated such groups have four common elements. Such groups

recruit defectively; they gain their loyal followers by the use of mind-control or thought-reform techniques; there normally is a living leader who demands, requires, obedience, almost total obedience; and there is something in the doctrine of the group which says that it is all right to break the law.

Coates testified her role in the organization was to serve as a referral resource. She had contacts with cult members as well as other people throughout the country. Coates had obtained information about the group on the Rulo farm from newspaper accounts, talking with individual members, and reading some depositions and literature from members. She had also met and spoken briefly with the defendant. The literature she read included two exhibits received into evidence. She testified the literature espoused a philosophy that was historically incorrect, one based upon the "protocols of the elders of Zion." Cole testified that her research revealed such "protocols" had never existed, but a document bearing that title was written in 1864 as a satire of Napoleon III. It was later rewritten and attributed to

Maurice Jolly, and was supposed to be a conversation between Machiavelli and Montesquieu, having nothing to do with Judaism, Jewry, or anything related. Later, it was plagiarized and used in "a trashy German novel." It was then plagiarized again and printed in Russia in the early 1900s. At some time between 1905 and 1917, she testified, "it was said to be the secret minutes of a secret meeting of the elders of Judaism or Zionism." The essence of the minutes was some sort of plan to rule the world, which became the basic philosophy of the Posse Comitatus, even though it began as a joke in 1864.

Coates testified the element of mind control was present at the Rulo farm, in that the members were isolated and there was a kind of group paranoia. She viewed their quest to please Yahweh as part of the mind control on the farm. Coates testified Ryan was the "living leader" of the group, and the fourth factor, illegal acts, was also present. She stated people who have been involved in such groups can be "deprogrammed" through an educational process.

Coates testified she had been given, and had perused, a copy of Mike Ryan's Bible which he had edited and customized for use on the farm. The "Bible" had been extensively revised, and there were places where the meaning of a Bible verse had been reversed by changing the word "good" to "bad." Coates testified a revised Bible is often used in religiously oriented destructive groups and is one method of mind control. Coates testified she viewed nonleaders of such groups as victims of circumstance and deception. She testified there are special problems in rehabilitating children involved in such groups because they have "no life experiences to which they can return. All that they know is the group." She stated rehabilitation of such children is possible, but difficult. It was her opinion the type of isolation experienced by the defendant was devastating. In her opinion an average length of time people such as the defendant require counseling is from 6 months to 2 years.

Coates had spoken with the defendant for about 30 minutes the morning of the hearing. It was her impression the defendant was very concerned about and afraid of Yahweh.

The next witness to testify was Rick Stice. Stice testified the Ryan family moved to his farm near Rulo in the summer of

1984. He testified that at that time he believed he and Ryan could talk to Yahweh. Stice testified that at one time he believed Yahweh had made him a high priest and the spirit of the Archangel Raphael lived within him. He also testified he believed at that time that he could talk to Yahweh in his mind. He was demoted to the status of slave, without explanation, in February or March 1985. He further testified that in March 1985 his son, Luke Stice, began to be abused by some of the others on the farm. He testified Ryan had told him the abuse was directed by Yahweh. Luke was physically punished during the entire month of March. Ryan left the farm for a weekend around the 10th of that month. Stice then left the farm but did not take his son, even though he had already been abused. Stice returned to the farm voluntarily 7 days later, and his son was killed about 2 or 3 weeks later, after further abuse. Stice admitted abusing his son during that time. He stated he participated because his life and those of his other children were threatened, as well as facing threats of eternal damnation. After his son's death, Stice again left the farm but left his two other children there because they were not in any danger. He did not report the murder because he was afraid of Yahweh. Stice testified he still believed in Yahweh and had had visions since leaving the farm, but had not tried to talk to Yahweh. Stice testified that while he lived on the farm he believed in the imminent approach of Armageddon, and that he was one of those chosen to lead the fight against evil. He testified he still believed Armageddon would occur, but now kept it to himself. He no longer believed Ryan had the Archangel Michael or could speak with Yahweh, although he had believed it while he lived on the farm. After he had been separated from the farm for almost 3 months, Stice realized Ryan could not talk to Yahweh. Stice thought he had been brainwashed while on the farm.

Stice stated he had entered into a plea agreement whereby he agreed to cooperate with authorities in exchange for being charged with one federal felony.

Stice testified that when he left the farm on March 10, 1985, his son was clad only in his underwear, had been separated from his siblings, and was living with adults only. When Stice escaped

he had been living with his son in the south trailer.

The next witness was Victor Faesser, one of the defendant's attorneys. He identified and sponsored several school records and records of phone conferences with former schoolteachers of the defendant. He testified he had spoken with the director of the Youth Development Center at Kearney and was told of the counseling and rehabilitation measures used there. He was told they use a group-therapy program, based on peer groups, which is very successful. He further testified the institution has an educational psychologist on its staff.

On cross-examination Faesser testified he had had prior contact with the workings of the juvenile system and understood such jurisdiction terminates when a juvenile reaches the age of 19. He further testified the release decision is an administrative decision, over which the courts have no jurisdiction.

The defense then rested, and the State called a rebuttal witness, Jeff Clausen. Clausen is a juvenile parole officer for the Nebraska Department of Correctional Services. His job involves supervising juveniles once they are paroled out of the Youth Development Center at Kearney. In his experience, a youth offender is generally confined at Kearney for an average stay of 7 to 8 months. The juveniles then may be supervised by a parole officer until they are 19, but are usually supervised for only 6 months if they "perform well." Clausen testified he was familiar with the counseling services available both at Kearney and at the correctional center in Lincoln. He testified both institutions provide the same type of counseling. It was his experience that youthful offenders were generally kept at the correctional center, and are segregated from the older offenders. He testified the term "youthful" applied to offenders aged 17 and older. He estimated the majority of the prison population at that facility were in their 20s.

Clausen testified that he felt his program could benefit juveniles up to the ages of $17^1/_2$ to 18 years of age. He testified that once a juvenile reaches the age of 19 he is automatically discharged without any continuing supervision.

Based on the evidence which has been summarized, the trial court found that a sound basis existed for the court to retain

jurisdiction of the defendant's case. The findings may be summarized as follows:

The trial court found that the types of treatment the defendant would most likely be amenable to were available in the juvenile court as well as adult court but that certain types of treatment available in adult court would not be available in juvenile court. The court found this consideration weighed in favor of retaining jurisdiction.

The trial court next found the alleged offense included violence and was committed in an aggressive and premeditated manner, another factor which the trial court found weighed in favor of retaining jurisdiction. The trial court found the apparent motivation for the commission of the offense was religious or cult fanaticism, which, according to the evidence presented at trial, was still present in the defendant and weighed in favor of retaining jurisdiction.

The trial court also found that the defendant's age of 16 years and the fact the others involved were adults weighed in favor of retaining jurisdiction.

The trial court further found the defendant did not have a previous juvenile or criminal record but that the defendant did have a previous history of antisocial behavior connected with his religious or cult fanaticism. The trial court further found there was evidence that rehabilitation might be difficult because of the defendant's inability to relate to the real world, another consideration which favored retention.

The trial court also found that there was evidence the defendant had the maturity of a 12- or 13-year-old, which might mean it would be very difficult to rehabilitate him while under the jurisdiction of the juvenile court and before he attains the age of 19, another consideration which weighed in favor of retention.

Finally, the trial court found that the best interests of the juvenile and the security of the public required custody or supervision extending beyond the defendant's minority, which weighed in favor of the retention of jurisdiction.

The defendant contends the evidence does not support the trial court's findings. The defendant argues the trial court implied, in finding No. 1, that the defendant was amenable to

treatment in the juvenile system, and therefore that criterion must be held in favor of the defendant. The defendant further argues that finding the offense was violent does not automatically mandate retention in the district court; that the defendant's membership in the cult was the result of his parent's actions rather than his informed choice, and therefore the third finding should weigh in his favor; that due to the influence of the adults in the perpetration of the offense, the fourth criterion should weigh in his favor; that since rehabilitation possibilities were presented and the defendant had no prior record, the fifth consideration weighed in his favor; the defendant's maturity level and treatment required the trial court to find in his favor on the sixth criterion; that since the court found there were juvenile programs available, the seventh consideration weighed in his favor; that there was no showing of a threat to the public by allowing the defendant to be treated as a juvenile; and, finally, that the court failed to make any findings with regard to criterion No. 9. The defendant argues the disparity in treatment between the defendant and others involved in the crime is a factor which weighs in favor of transferring the case. Finally, the defendant argues the State failed to establish a sound basis for retaining jurisdiction in the adult court.

The State contends the trial court fully complied with all of the statutory requirements for the juvenile transfer hearing, and its decision was supported by the evidence presented at the transfer hearing. The State contends the record shows the trial court's findings were proper and supported retention.

The record shows the trial court informed the defendant of his right to request waiver to the juvenile court and held an evidentiary hearing at which the county attorney and the defendant presented evidence on the issues pursuant to Neb. Rev. Stat. § 29-1816 (Reissue 1985). The trial court then considered the relevant statutory criteria, determined a sound basis existed for retaining jurisdiction, and set forth its findings. § 29-1816. In making the findings the court considered the criteria set forth in Neb. Rev. Stat. § 43-276 (Reissue 1984).

Section 43-276 requires a consideration of the following criteria:

(1) The type of treatment such juvenile would most likely be amenable to; (2) whether there is evidence that the alleged offense included violence or was committed in an aggressive and premeditated manner; (3) the motivation for the commission of the offense; (4) the age of the juvenile and the ages and circumstances of any others involved in the offense; (5) the previous history of the juvenile, including whether he or she had been convicted of any previous offenses or adjudicated in juvenile court . . . and other previous history of antisocial behavior, if any, including any patterns of physical violence; (6) the sophistication and maturity of the juvenile as determined by consideration of his or her home, school activities, emotional attitude and desire to be treated as an adult . . .; (7) whether there are facilities particularly available to the juvenile court for treatment and rehabilitation of the juvenile; (8) whether the best interests of the juvenile and the security of the public may require that the juvenile continue in custody or under supervision for a period extending beyond his or her minority and, if so, the available alternatives best suited to this purpose; and (9) such other matters as the county attorney deems relevant to his or her decision.

In *State v. Alexander*, 215 Neb. 478, 486, 339 N.W.2d 297, 301 (1983), we considered these statutory requirements. We there stated:

In deciding whether to grant the requested waiver and to transfer the proceedings to juvenile court, the court having jurisdiction over a pending criminal prosecution must carefully consider the juvenile's request in the light of the criteria or factors set forth in § 43-202.01. There is no arithmetical computation or formula required in a court's consideration of the statutory criteria or factors. . . . [T]he court need not resolve every factor against the juvenile. Also, there are no weighted factors, that is, no prescribed method by which more or less weight is assigned to each factor specified in the statute. [Citations omitted.]

The statutory criteria or factors of § 43-202.01 disclose a balancing test by which public protection and societal

security are weighed against practical and not problematical rehabilitation of the juvenile. [Citations omitted.] "Rehabilitation has traditionally played a key role in the treatment of young offenders. . . . Nevertheless, the concept of deterrence and the need to balance individual justice with the needs of society—a balancing process that is basic and fundamental to the general scheme of the criminal law—also have a place in the juvenile justice system."

(Quoting *State in the Interest of C. A. H. & B. A. R.*, 89 N.J. 326, 446 A.2d 93 (1982).) As a result, some youths will be held accountable as adults so that future antisocial misconduct can be effectively deterred.

We then applied the balancing test to the facts of that case and upheld the retention of jurisdiction. The case involved a 14-year-old boy who had been charged with first degree murder, robbery by violence, and terroristic threats. The murder victim was an 80-year-old man who had been beaten to death by the defendant. The defendant had a lengthy juvenile record, had been diagnosed as significantly immature, functioned at an average intellectual level, and had a sustained rule-breaking pattern of behavior. At the evidentiary hearing evidence was presented that there was some chance of rehabilitation, which would possibly require many years of treatment.

Similarly, in *State v. Broomhall*, 221 Neb. 27, 374 N.W.2d 845 (1985), the retention of jurisdiction of a 14-year-old boy was upheld by this court. Broomhall had attacked, brutally beaten, and sexually assaulted a woman. In *State v. Selman*, 204 Neb. 833, 285 N.W.2d 832 (1979), a 14-year-old boy was tried as an adult for shooting with intent to kill, wound, or maim. Selman had a lengthy record, and we found sufficient evidence in the record to support retention. In *State v. Moore*, 209 Neb. 88, 306 N.W.2d 183 (1981), a 14-year-old boy was tried as an adult and sentenced to life imprisonment for his role in the death of an Omaha cabdriver. The boy and his brother had instructed the driver to take them to an isolated area, where they robbed him and the older brother shot him. The defendant's argument that he was under the influence of his older brother was found to be unpersuasive, and the retention was upheld.

The standard of review applicable to an appeal from a denial of waiver to juvenile court is abuse of discretion. *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977).

We find the district court did not abuse its discretion in retaining jurisdiction. All of the statutory provisions concerning transfer hearings were fully complied with. The record supports the trial court's findings that the crime was violent and the defendant may require treatment beyond the age of majority. Further, the nature of the offense and the defendant's beliefs at the time of the hearing were such that the defendant's rehabilitative needs were beyond the scope of the juvenile court. Further, more protection of the public was required than is available in that court. The defendant's first assignment of error is therefore overruled.

The defendant next contends the trial court erred in receiving certain photographs into evidence which, he contends, were so gruesome that the prejudicial effect of the photographs exceeded their probative value. The defendant argues the photographs did not illustrate or clarify the only controverted issue involving the autopsy: ante mortem versus post mortem injuries. The defendant argues the photographs were cumulative evidence and that the pathologist's testimony alone would have sufficiently described the victim's injuries. The defendant further argues the pathologist could have testified adequately without the photographs.

In support of this contention the defendant relies on *State v. Partee*, 199 Neb. 305, 258 N.W.2d 634 (1977). In that case we stated that all of the circumstances of each case must be considered in determining the admissibility of photographs, including whether a witness, particularly a pathologist testifying about an autopsy, can adequately testify without them. The defendant also complains about the introduction of a photograph showing the victim alive and healthy, arguing the photograph was unnecessary and its stark contrast with the other photographs of the victim was unfairly prejudicial.

The State contends the photographs were introduced to prove the State's case. The State relies on *State v. Lynch*, 215 Neb. 528, 535, 340 N.W.2d 128, 133 (1983), where we stated, "Gruesome crimes produce gruesome photographs.

Gruesomeness by itself is not a sufficient reason to keep photographs from the jury, if the probative value of the photographs outweighs the possible prejudice to one accused of a crime." The State further argues the admission of evidence is within the sound discretion of the trial court and that photographs are admissible to show the condition of the body, the nature and extent of wounds and injuries, and to establish malice or intent. See, *State v. Freeman*, 201 Neb. 382, 267 N.W.2d 544 (1978); *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1979). The State argues the defendant's malice or intent with regard to the crime was at issue in the case, and proof of such elements was crucial.

The State then explains the relevancy of each photograph as follows. Exhibit 19 is a full-length view of the victim's body wrapped in the sleeping bag prior to the autopsy. The State contends the photograph was introduced to show the condition of the body when found. The State contends the photograph was not gruesome or inflammatory because the body is not visible.

Exhibit 24 is a full-length view of the victim's body prior to the autopsy. The State contends the photograph was introduced to show the condition of the body and aid in its identification. Exhibit 27 shows the victim's back and was introduced to show the linear bruises described by the pathologist.

Exhibit 28 depicts the victim's buttocks, illustrating the condition of the body and the extent of an injury allegedly inflicted by the defendant. Exhibit 29 is a closeup of the victim's hand, introduced to show the injuries sustained on that limb. Exhibit 30 depicts the victim's broken thigh bones, again introduced to show the extent of an injury allegedly inflicted by the defendant.

The State cites several cases in which the admission of certain photographs was upheld despite their contents. See, e.g., *State v. Rowe*, 210 Neb. 419, 315 N.W.2d 250 (1982) (photographs of skull and torso of victim); *State v. Jones*, 213 Neb. 1, 328 N.W.2d 166 (1982) (photographs of dismembered body).

At the trial the State presented testimony by a pathology assistant, a pathologist, and the victim's sister to sponsor the photographs at issue.

David Hamilton, a pathology assistant with Pathology Medical Services in Lincoln, testified concerning the custody of the victim's body prior to the autopsy. Hamilton testified that exhibit 19 depicts the appearance of the body still wrapped in the sleeping bag prior to the autopsy. Hamilton testified as to the various details of the appearance. Hamilton then testified that exhibit 24 depicts an adult body, partially decomposed.

Dr. George Gamel, the pathologist who conducted the initial autopsy, then testified. Dr. Gamel also testified that exhibit 19 depicted the victim's body lying in a sleeping bag prior to the autopsy. He further testified that exhibit 24 depicted the body after it had been removed from the sleeping bag. Dr. Gamel testified he first noted the body had undergone extensive decomposition. His external examination revealed the head had been extensively injured; the chest had been crushed; the anus had been injured; the back had linear bruises, as from a beating; the genitals were missing; both legs were broken at thigh level; most of the skin on the right lower leg was missing; the fingertips of the left hand were damaged; and the left wrist or forearm was broken. Baling wire was wrapped around the wrists and ankles.

Dr. Gamel testified that the photographs of the body introduced into evidence depicted the various injuries.

At that point the jury was dismissed and the trial court heard the defendant's objections to the introduction of the photographs depicting the victim's body. The defendant objected to their introduction on the grounds the photographs were so prejudicial that any probative value was outweighed by that prejudice.

Dr. Gamel testified that due to the process of decomposition, even gross exterior observations were difficult for a professional. Dr. Gamel testified the photographs illustrated the broken bones very well, but the soft tissue injuries were difficult to see. Dr. Gamel testified a second autopsy had been performed, and the only area of disagreement between the pathologists was as to which injuries were inflicted before the victim's death.

The trial court had previously ruled the photographs were not admissible unless they were introduced to illustrate the

pathologist's testimony. Dr. Gamel, asked a foundational question, testified there were no injuries which he could not orally describe to the jury.

Dr. Gamel then testified that exhibit 30 shows the broken thigh bones and exhibit 29 the injury to the left hand; neither photograph dealt with a soft tissue injury. He testified that exhibit 28 illustrated the victim's dilated anus. He then testified the photographs depicted the injuries described in his testimony and would assist the jury in determining what those injuries were. Dr. Gamel testified that exhibit 27 depicted the linear bruises on the victim's back, which exhibit, in his opinion, would help the jury get a better idea of the injury. He further testified exhibit 24 would assist the jury in ascertaining the condition of the body. Dr. Gamel further testified that exhibits 27, 28, 29, and 30 would assist him in depicting the injuries to which he was testifying. He further testified the exhibits were accurate depictions of the injuries.

The court asked Dr. Gamel if the pictures were repetitive or depicted separate injuries. The witness replied that each picture showed a separate injury. The court then received the photographs into evidence and overruled the defendant's motion for a mistrial.

Dr. Gamel testified he believed the linear bruises depicted on exhibit 27 had been caused by a blunt stick or whip. Dr. Gamel testified that exhibit 28 shows the dilated anus of the victim. Dr. Gamel testified that the leg fractures depicted in exhibit 30 were caused by a blunt-force injury of some type. Dr. Gamel testified the left arm was also broken by a twisting or blunt force. Dr. Gamel testified that a metallic foreign body was found lodged in the skull when the skull was x-rayed.

Dr. Gamel testified that an internal examination of the body revealed the head was extensively damaged, and there was a gunshot wound in which the shot had entered the right cheek. The entire left side of the skull was shattered into multiple small fragments. Dr. Gamel testified this damage could have been caused by a second gunshot on the left side of the skull. It was his opinion the injury on the left side of the skull was caused by either a gunshot or blunt-force injury.

Dr. Gamel testified that many of the victim's ribs were

broken, and one rib was protruding into the chest cavity. Blood was found in the right chest cavity, which the witness believed was probably caused when the injuries occurred.

Dr. Gamel testified a blunt object had been inserted into the anus and pushed far up into the body cavity. He suspected the object had damaged the left lobe of the liver.

Dr. Gamel testified the victim's genitals were missing, and it was difficult to determine the cause. It was his opinion it was "most likely" they had been cut away. There were some sharp edges in that area which suggested removal had occurred before the body was buried. Dr. Gamel then testified that some of the skin on the right lower leg had been stripped off.

Dr. Gamel testified that the second pathologist who examined the body, Dr. Eckert, believed there had been two shots to the head, had found about one-half cup of grain in the victim's stomach, and had pointed out the left lobe of the liver was abnormal. It was Dr. Gamel's opinion the victim died of multiple traumatic injuries. He testified the gunshot wound or wounds in the head would have been fatal, and he could not determine whether the victim was then alive. Secondly, the crushed chest injury would have been fatal, and death would have occurred within minutes after such an injury. Dr. Gamel believed it was probable the victim was alive during the chest injuries. Dr. Gamel testified the broken thigh injuries would have been fatal due to shock, after a period of time. Dr. Gamel was unable to determine with certainty whether the victim was alive when his legs and arm were broken, but he suspected the victim was alive when his legs were broken. He testified it was most likely the victim was alive when the anal injury occurred.

Dr. Gamel testified the broken arm could have caused death in conjunction with the victim's other injuries, and the injury to the anus would have caused death eventually. Although the injuries to the victim's hand would not have been fatal, the whipping caused injuries on the back which could have been fatal.

Miriam Kelly, the victim's sister, was then called as a witness for the State. She testified that exhibit 9 was a photograph of the victim which accurately depicted his appearance in 1984. The defendant objected to the introduction of the exhibit on the

grounds of relevance and prejudice. The exhibit was received into evidence.

As we stated in *State v. Jones*, 213 Neb. 1, 8, 328 N.W.2d 166, 171 (1982), "The admission into evidence of gruesome photographs rests in the sound discretion of the trial court, which must determine their relevancy and weigh their probative value against their possible prejudicial effect." (Citing *State v. Freeman*, 201 Neb. 382, 267 N.W.2d 544 (1978).) We further cautioned that the probative value of gruesome photographs must be carefully weighed by the trial courts, which must determine the relevancy of the photographs and weigh their probative value against their potentially prejudicial effect. In that case we upheld the admission of photographs which depicted the brutal murder of a mother and daughter. The photographs showed the condition of the bodies prior to the autopsy and showed the causes of death, and the pathologist testified the photographs aided his testimony.

In *State v. West*, 223 Neb. 241, 248, 388 N.W.2d 823, 830 (1986), we upheld the admission into evidence of photographs of one of the victims. We there stated the photographs

> helped the jury to visualize the crime and view described events in proper context. The fact that a photograph might present a gruesome spectacle does not prohibit its admission in evidence. *State v. Lynch*, 215 Neb. 528, 340 N.W.2d 128 (1983).
>
> In a homicide case photographs of the victim, upon proper foundation, may be received in evidence for purposes of identification, to show the condition of the body, the nature and extent of the wounds and injuries, and to establish malice or intent.

We then found that the photographs at issue, in conjunction with the testimony of the examining pathologist, served those purposes.

Similarly, several gruesome photographs of a homicide victim were held admissible in *State v. Lynch*, 215 Neb. 528, 340 N.W.2d 128 (1983). The pathologist referred to the photographs in the course of his testimony about the nature and location of the wounds and the cause of death. We held the photographs were relevant because they tended to correlate the

victim's wounds with the defendant's knife. We there stated at 535, 340 N.W.2d at 133, "These photographs show a series of systematic, sadistic, and savage slashes in the victim's throat— visual proof from which a jury could reasonably infer that the homicide was committed with 'deliberate and premeditated malice.' " Illustration of the wounds in conjunction with the pathologist's testimony, that is, the location, number, and nature of such wounds, supplied evidence to prove the cause of death assigned by the pathologist. Generally, relevant evidence regarding causation of death in homicide cases is admissible, and the photographs in question were admissible under the circumstances. Gruesome crimes produce gruesome photographs. Gruesomeness by itself is not a sufficient reason to keep photographs from the jury, if the probative value of the photographs outweighs the possible prejudice. We then found the photographs had probative value regarding the elements the State had to prove, and upheld their admission.

In *State v. Partee*, 199 Neb. 305, 258 N.W.2d 634 (1977), we upheld the admission of photographs depicting the victim of a brutal beating. We there stated that in determining admissibility the trial court must consider all the circumstances of the case, including whether a witness can effectively testify to the pertinent facts without the need of numerous photographs, or any photographs at all. In *State v. Williams*, 205 Neb. 56, 287 N.W.2d 18 (1970), we stated a gruesome photograph may be admitted if it makes clear some controverted issue in the case.

Our review of the record shows that the trial court did not abuse its discretion in admitting these photographs. While five of the photographs were gruesome, they were utilized by the pathologist to illustrate his testimony concerning the condition of the body and the nature and extent of injuries sustained by the victim. They were also pertinent to a controverted issue in the case: the disagreement regarding whether certain of the injuries occurred before or after death. Further, the photographs helped the jury to visualize the enormity of the torture, from which an inference regarding the defendant's participation could be drawn. The introduction of a picture of the victim shortly after his move to the Rulo farm was also proper, as it was used to identify him. This assignment of error

is overruled.

The defendant next contends the trial court's failure to admit relevant evidence denied the defendant his right to a fair trial. In particular, the defendant contends the depositions of Norbert and Maxine Haverkamp and evidence of the defendant's parents' prior sexual relationship with Sherry Kidd should have been admitted so that the jury could fully evaluate the defendant's mental state.

The State contends the trial court properly excluded that evidence after carefully weighing the interests of the defendant and his codefendant, Ryan. Ryan had objected to the introduction of the Haverkamp depositions on the grounds of relevancy, prejudice, insufficient foundation, and infringement of his constitutional rights. Michael Ryan objected to Sherry Kidd's testimony on the grounds of prejudice and relevance. The State further argued the defendant did not establish a connection between his mental state and his parents' relationship with Sherry Kidd because, at trial, Mrs. Ryan testified the defendant was probably not aware of the Ryans' relationship with Sherry Kidd because an effort had been made to hide it.

The depositions of Maxine and Norbert Haverkamp are in the record, and we have examined them. Norbert Haverkamp testified he had not spoken with any of the people who had lived at the Rulo farms about the victim's death. He further testified his wife did not inform him of the occurrences on the farm, or of the deaths. He had not visited the Rulo farm since June or July of 1984, and did not visit the farm after that time because his wife and son had told him he would be killed if he tried. The members of the group refused to talk to him after the middle of August 1984, except that Jim Haverkamp would talk to him about the children. Norbert Haverkamp had never talked much with the defendant, and had no direct contact with Michael Ryan from August 1984 until approximately August 1985. He had no personal knowledge of any of the events that occurred on the farm between August 1984 and August 1985, and had not been brainwashed.

Maxine Haverkamp testified that she believed she had been brainwashed. She believed Michael Ryan could talk to God,

and also believed in the arm control test. She had not seen the accidental shooting of James Thimm, although she was on the farm that day. She further testified she had not spoken with the defendant on that date or subsequently, and had only spoken with Ryan about the incident. She testified that Ryan had told her that Yahweh made the gun go off. Mrs. Haverkamp was unsure whether she was on the farm during the time James Thimm was tortured, murdered, and buried. Later, she was told that it had occurred, or she overheard the two defendants laughing and talking about whipping Thimm. None of the participants in the murder told her what had happened until after her son was arrested. She testified Ryan had controlled their minds by suppressing all forms of self-expression, had constantly criticized and denigrated their beliefs and opinions, and had yelled at them and made fun of them.

The trial court reviewed the depositions and sustained Ryan's objection to their admission. The defendant's attorney had testified the Haverkamps had avoided service of process, in an attempt to show unavailability in support of the introduction of the depositions. The State conceded the two Haverkamps had been told by the State that they would not be called as witnesses and, when they were told they would be called for the defense, had disappeared. A certified copy of the sheriff's return, showing the witnesses were not found, was received into evidence. The defendant argued proper foundation for the two depositions had been laid. His codefendant objected to the admission on the grounds the testimony was not relevant to Dennis Ryan's defense, the defense had failed to show good-faith efforts to produce the witnesses, the introduction of the testimony would violate Ryan's right to confront his accusers, the prejudicial effect of the testimony would outweigh its probative value, and insufficient foundation had been laid to connect the testimony with the defendant's mental condition. The State further argued Norbert Haverkamp had not been on the farm from August 1984 to August 1985, and the testimony of both contained much uncharged misconduct against the codefendant.

The defendant's attorney argued there was no violation of Ryan's confrontational rights because his attorney had

vigorously cross-examined both witnesses during the depositions. The defendant contends the testimony was relevant to show Ryan's dominance of the situation, the mind control he exerted over the deponents, and the testimony concerning brainwashing.

The defendant also attempted to introduce testimony by Sherry Kidd as to an adulterous relationship she had previously engaged in with the defendant's parents. Ryan's attorney objected to this testimony on the grounds that it contained uncharged misconduct and was not relevant. The relationship had occurred 6 years prior to James Thimm's death. The trial court stated it would sustain the objection unless the defendant could lay some foundation for the testimony. The court then stated it would permit the witness to testify as to the defendant's character, but not as to the witness' relationship with Ryan. The trial court stated that her testimony was not relevant unless the defendant produced some testimony making the defendant's early years relevant to his insanity defense. The defendant then made an offer of proof, and the State joined Ryan's counsel in objecting to the testimony on the grounds it was not relevant. The trial court sustained the objection, but told the defendant the witness could be recalled if some connection was shown between the defendant's insanity defense and his family situation during the time of the relationship.

The admissibility of evidence, preliminary questions concerning the qualification of a person to be a witness, and the existence of a privilege are issues to be determined by the court. Neb. Rev. Stat. § 27-104(1) (Reissue 1985). The admission or exclusion of evidence is a matter within the sound discretion of the trial court and will be upheld absent an abuse of discretion. *State v. Clancy*, 224 Neb. 492, 398 N.W.2d 710 (1987). See, also, *State v. Kern*, 224 Neb. 177, 397 N.W.2d 23 (1986).

Neb. Rev. Stat. § 27-403 (Reissue 1985) provides for the exclusion of relevant evidence if its probative value is substantially outweighed by unfair prejudice. Neb. Rev. Stat. § 27-404(2) (Reissue 1985) provides for the exclusion of some character information when used to prove the character of a person and show that person acted in conformity with that character. Whether evidence of previous conduct is not relevant

because of remoteness or lack of similarity is a matter within the sound discretion of the trial court. *State v. Keithly*, 218 Neb. 707, 358 N.W.2d 761 (1984). Relevant evidence is evidence having any tendency to make the existence of a fact of consequence to the determination of the action more probable or less probable than it would be without such evidence. Neb. Rev. Stat. § 27-401 (Reissue 1985).

We find the trial court did not abuse its discretion in excluding the Haverkamps' depositions and Sherry Kidd's testimony. Norbert Haverkamp testified he was not "brainwashed" by Michael Ryan and had not been on the Rulo farm for some time prior to Thimm's murder. He had no personal knowledge of the occurrences on the farm or the defendant's participation therein. The defendant made no showing as to the relevance of this testimony, and we find it was properly excluded.

The deposition of Maxine Haverkamp presents a somewhat closer question. She was present on the farm during the months prior to the murder, and possibly was on the farm when the murder occurred. She believed she had been brainwashed, had some personal knowledge of some of the occurrences at the farm, and had some idea of Ryan's role therein. However, her testimony was not crucial to the defense, because it was duplicative of testimony given by other members of the group and would have provided cumulative evidence only. We find the trial court did not abuse its discretion in excluding this testimony.

Finally, we find that Sherry Kidd's testimony was properly excluded. There was no showing by the defendant of any connection between Kidd's relationship with his parents and his mental state at the time of the murder. Hence, this testimony was not relevant to the defendant's insanity defense and was properly excluded.

The defendant next contends the trial court erred in refusing to give two jury instructions. The defendant has only presented argument concerning one jury instruction. Accordingly, the assignment of error concerning the other omitted instruction will not be addressed. See *State v. Lynch*, 223 Neb. 849, 394 N.W.2d 651 (1986).

The requested instruction which was briefed and argued was instruction No. 4. It stated:

> To be an aider and abetter one must knowingly and voluntarily and with common intent with the principal unite in commission of the crime.
>
> If the intent of the aider is different from that of the perpetrator, the aider's guilt is measured by the intent that actuated or moved him to act.

The defendant argues there was evidence presented to support this instruction in the form of testimony which tended to show he did not share his father's intent to kill, but instead intended only to please Yahweh. The defendant argues that had this instruction been given the defendant could have been found guilty of manslaughter, as that crime does not require proof of a specific intent to kill. It is the defendant's position that there was an absence of specific intent, due to insanity or his mental condition caused by brainwashing, which theory formed the basis of his defense, and that denial of this instruction prejudiced the defense. He further argues that since no comparable instruction was given, the denial of the instruction constitutes prejudicial error.

The State contends the instruction was properly rejected because it did not accurately state the law in Nebraska and, further, that instruction No. 12, which was given, does correctly state the law. The State also contends the defendant waived the review of this issue because he did not object to the jury instruction when given. The State further contends the instructions, when read as a whole, properly submitted the case to the jury and that the defendant has failed to show he was prejudiced by the instructions given.

Instruction No. 2 stated the defendant had been charged with purposely and deliberately, and with premeditated malice, killing James Thimm. It further stated the defendant had entered a plea of not guilty to the charge and that it was the jury's duty to determine the verdict. The jury was instructed to separately determine the guilt of each defendant. The jury was instructed, in instruction No. 7, as to the elements required to find the defendant guilty of first or second degree murder, manslaughter, not responsible by reason of insanity, or not

guilty. In each murder and manslaughter instruction the jury was instructed that the State had the burden to prove the defendant killed the victim alone or while aiding and abetting another. The jury was instructed as to the insanity defense. An instruction concerning the intent required for the degrees of murder charged was given. An instruction was given in which "purposely," "deliberate," "premeditated," and "malice" were defined.

Instruction No. 11 explained that intent was a material element of the crime charged against the defendant. It further stated the jury was required to determine the defendant's intent from all of the facts and circumstances in the record. It also stated that intent is not a material element in the offense of manslaughter.

The last paragraph of the instruction provided:

Where a crime requires the existence of a particular intent, an alleged aider or abettor cannot be held as a principal unless it is established that the aider knew that the perpetrator of the act had the required intent, or that the aider himself . . . had the required intent. If the intent of the aider is different from that of the perpetrator, the aider's guilt is measured by the intent that actuated him . . . .

The jury was also instructed, in instruction No. 12, concerning the elements required to prove aiding and abetting.

The failure to object to an instruction after it has been submitted to counsel for review will preclude raising an objection on appeal. *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987). Further, all of the instructions must be read as a whole, and if the instructions, when read together, correctly state the law, are not misleading, and adequately state the issues, there is no prejudicial error.

At trial the defendant objected to instruction No. 7 because the element of aiding and abetting had not been added and the requested insanity instruction had not been incorporated. The defendant did not object to instructions Nos. 11 or 12, nor the exclusion of proposed instruction No. 4. The court rejected all of the proposed instructions which were inconsistent with those adopted by the court. The defendant did not object to this

ruling. Therefore, the issue regarding this instruction is not properly before us.

Moreover, our review of the record reveals no prejudice resulted to the defendant because of the jury instructions given. The jury was adequately instructed as to all of the relevant issues, the material elements of the crimes with which the defendant was charged, and the necessary instructions to explain the defendant's theory of the case. Instruction No. 12 correctly advised the jury concerning the intent required to prove the defendant guilty of aiding and abetting in the murder. See *State v. Rice*, 188 Neb. 728, 199 N.W.2d 480 (1972), *cert. denied* 430 U.S. 947, 97 S. Ct. 1584, 51 L. Ed. 2d 795 (1977). That instruction included the portion of the defendant's requested instruction concerning the effect of a difference in intent between a principal and an aider. These instructions, when read together, fairly and accurately submitted the case to the jury.

The final issue to be addressed is the defendant's contention that the trial court abused its discretion in sentencing the defendant to the maximum term possible for his conviction of second degree murder. The defendant contends this sentence is excessive and relies on *State v. Foutch*, 196 Neb. 644, 646, 244 N.W.2d 291, 292 (1976), where we stated a sentence should not exceed "the minimum period consistent with protection of the public, gravity of the offense, and rehabilitative needs of the defendant." The defendant argues certain criteria this court has considered in reviewing sentences weigh in favor of a lesser sentence, including

> family ties, age, mentality, education, experience, and social and cultural background . . .; his willingness to work at honest labor; his past criminal record or law abiding conduct; the motivation for the offense, the nature of the offense, and the amount of violence, if any, involved; the frankness and willingness of the defendant to cooperate; narcotic addiction, if any; circumstances aggravating or mitigating the offense; community attitudes toward the offense; and the individual's potentialities for reform or recidivism.

*State v. Etchison*, 188 Neb. 134, 137-38, 195 N.W.2d 498, 501

(1972).

The defendant argues his age, character, the nature of and motivation for the offense, his rehabilitative needs, and the protection of the public, when considered, show the sentence is excessive. The defendant places much weight on the alleged domination exerted upon him by his father, the isolation of the farm, and the fact that the defendants in several other cases received sentences of less than life imprisonment for committing second degree murder. The defendant further argues the trial court placed undue weight on the crime itself and the need to protect the public.

The State contends there was no abuse of discretion shown in sentencing the defendant to life imprisonment. The State argues the sentence is within the statutory limits and, absent a showing of abuse of discretion, should be affirmed. The State contends the trial court considered the relevant factors in imposing the sentence and properly placed great weight on the seriousness of the crime.

The defendant was convicted of second degree murder, which is a Class IB felony. Neb. Rev. Stat. § 28-304 (Reissue 1985). It carries a maximum penalty of life imprisonment and a minimum of 10 years' imprisonment. Neb. Rev. Stat. § 28-105 (Reissue 1985). The sentence imposed is within these statutory limits.

A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion. *State v. Sianouthai*, 225 Neb. 62, 402 N.W.2d 316 (1987). Moreover, the relevant question before this court is whether the defendant received an appropriate sentence, not whether someone else in a different case received a lesser sentence.

Our review of the record reveals there was no abuse of discretion in imposing the maximum sentence in this case. While the defendant contends his age, the isolation of the farm, and the influence of his father tended to create a type of mental illness described as folie a deux or shared paranoia, there was competent evidence presented from which the trial court could have inferred the defendant understood the nature of his acts and consciously chose to participate in the torture of James Thimm. In fact, there was evidence that the defendant enjoyed

participating in the torture of Thimm and laughed and bragged about the fact that he had helped to kill him.

The State presented testimony by Dr. Emmet Kenney as a rebuttal witness. It was Dr. Kenney's opinion that the defendant was not suffering from a mental illness at the time of the murder. He found no evidence in the defendant of neurosis or psychosis. It was his opinion the defendant understood what he was doing, understood the quality and nature of his acts, and had the capacity to distinguish between right and wrong at that time. Dr. Kenney further testified it was his opinion the defendant knew his acts were wrong and punishable. He further testified the defendant had sufficient mental capability to intend the obvious and probable consequences of his acts and could have formed a willful and corrupt intent. Dr. Kenney testified that, based on his evaluation of the defendant, the defendant was not suffering from a dependent personality disorder at the time of the offense. He testified the defendant showed a normal amount of dependency for a 15-year-old and, based on information concerning his participation in the group and his competitiveness, concluded he was not overly dependent.

The witness disagreed with the defendant's expert witnesses, who had diagnosed the defendant as suffering from the condition known as folie a deux or shared paranoia, although he testified it was his opinion that Ryan did suffer from a paranoid personality disorder. The witness testified he had been involved with members of various cults in his professional capacity, including those claiming to have been brainwashed, and testified he saw no evidence of brainwashing in the four people he saw from Rulo. Dr. Kenney testified he would not describe the group at Rulo as a cult but as an adult criminal gang, because the group functioned as a group engaged in a significant amount of criminal activity.

Dr. Kenney testified that, in his opinion, the defendant's maturity level varied from hypermature, or beyond his years, in his attitude of himself as a leader and his idea of appropriate friends, to immature in the area of social development. *Dr. Kenney concluded the defendant became involved in the torture of James Thimm because he derived pleasure from sadistic*

*behavior.* Dr. Kenney testified that the defendant enjoyed the farm life, described it as a "blast," and was "critical of people who tried to make it look as if it were an unpleasant place." He saw no evidence of serious psychiatric illness such that would produce a delusion in the defendant. It was his opinion the members of the group used the arm test and their religious beliefs as a way of gaining status and giving status within the group. Dr. Kenney testified that in such a group

> the leader has no real qualifications usually for leadership, so he controls his group by either allowing them special privilege with him, and he keeps them in line in one of two ways — what we call crowing on them — you know, mocking them, putting them down, humiliating them — or cutting them out of the group . . . .

Dr. Kenney testified that, in his opinion, the defendant's belief in Yahweh was probably sincere and that he probably believed such a belief entitled him to membership in a special group, and, as long as he went through a ritual, he could do illegal and cruel things. Dr. Kenney stated such a belief would be attractive to a person the defendant's age. Dr. Kenney testified that while the defendant probably subscribed to the attitude of the group, he also knew what the law was at the time. It was his opinion the defendant made up stories about his "visions" to gain status with the group. He characterized the group's belief system as self-serving. He questioned the defendant's theory that he was completely dominated by his father, because, according to the defendant's own version of the facts, there were a number of times people, including the defendant, had disobeyed Ryan. Dr. Kenney also testified it was his understanding that when Ryan left the farm, the defendant and Tim Haverkamp did not follow Ryan's orders, but behaved more aggressively in their treatment and punishment of the other members.

Four mental health experts testified on the defendant's behalf, giving their opinions as to possible diagnoses of the defendant's mental health and his capacity to appreciate the nature of his actions at the time of the offense.

Dr. Herbert Modlin testified it appeared the defendant enjoyed being assigned a weapon while on the farm. The

defendant had indicated he was "reasonably content with this kind of life. He didn't see anything very much wrong with it." Dr. Modlin testified the defendant was well able to keep in contact with reality during that time. It was his opinion the defendant's maturity level was more like a 12-year-old's than a 16-year-old's, and diagnosed the defendant as suffering from a dependent personality disorder. He testified such a disease is treatable "[t]o some extent," and the prognosis is enhanced by the defendant's youth. It was his opinion the defendant should be "deprogrammed" to rejoin general society and that such treatment would be long term, requiring some number of years. It was his belief the personality disorder played an important role in the defendant's participation in the torture-murder, and resulted in his following the group. Dr. Modlin testified that the defendant had apparently believed he was doing the right thing by following Yahweh's orders. Dr. Modlin testified it was his belief the defendant did not pose a further danger to the community because his participation was directed by his father. He further testified the defendant did have a tendency to follow and could fall into some other kind of cult or belief in the future and again be led down the wrong path. Dr. Modlin testified there was no evidence the defendant suffered from paranoia or schizophrenia, and stated "this kid is well put together." Dr. Modlin could not testify to any particular reasons to support his opinion that the defendant was overly dependent on his father. He also testified it was his belief the defendant understood right from wrong at the time of the torture-murder. Dr. Modlin further testified the defendant was capable of forming an intent at that time.

Dr. Cole also testified as an expert psychological witness for the defendant. It was his opinion the defendant was more adamant about his beliefs in December 1985 than he had been in October 1985. It was his opinion the defendant was suffering from shared paranoia. He believed the belief system espoused by the Rulo group was a systematized religious delusion. He believed the defendant was susceptible to such a delusion because of his youth and immaturity. It was his opinion the defendant's delusion was persecutorial. Dr. Cole also described the defendant as having formed a fairly normal relationship

with another member of the group. Dr. Cole testified the primary source of the delusion was Ryan, and also other people in the group. He defined the religious belief system as delusional because it defied credibility; therefore, an individual who believed in it would have had to have been suffering from a delusion.

Dr. Cole further testified that, in his opinion, the defendant's disorder was treatable, in part because of his youth, but for such treatment to work the defendant's father would have to cooperate and the defendant would have to establish attachments to people having different belief systems. Dr. Cole testified that such treatment would require several years, at minimum. Dr. Cole testified the defendant believed he was doing the right thing by participating in the torture-murder. He further testified it was his opinion that the defendant did, at that time, have the capacity to understand the nature and quality of his acts.

Dr. William Logan also testified on the defendant's behalf. He testified the defendant showed little emotion regarding James Thimm's death. The defendant had reported no difficulty in sleeping or nightmares as a result of his participation. Dr. Logan testified that when he asked the defendant what he would have done if Yahweh had prophesied or told the group the defendant should be tortured as was James Thimm, the defendant's response was "I'd either fight or run and get out of there."

It was Dr. Logan's opinion the defendant was suffering from a shared psychosis with his father. He believed the shared psychosis had developed because the father was suffering from delusions, and those delusions were transmitted to the defendant because his father was a very important person in the defendant's life. This was exacerbated because the family lived in a close-knit, isolated environment for a fairly extended period of time. Dr. Logan viewed the belief system of the group as delusional because it was so aberrant and unusual as compared to what an ordinary person would think. Dr. Logan also testified the defendant apparently was gratified by his acceptance as a man and enjoyed his rank on the farm.

It was his opinion that, at the time of the murder, the

defendant understood a man was being killed. He further testified that it was his opinion the defendant's ability to determine right and wrong at that time had been distorted by a major mental illness. It was his opinion the defendant could not have formed a willful and corrupt intention at that time. He also testified the defendant would have known his participation in the murder was wrong in the eyes of the law and that he could be punished for it.

The defendant testified at trial. He admitted he had not always been truthful with the psychiatrists, psychologists, and investigators that he had spoken with. He testified that he did not understand why James Thimm was supposed to be tortured.

When asked about the murder he gave the following version. He stated a shovel handle was inserted into the victim's rectum, and Michael Ryan, the defendant, Timothy Haverkamp, James Haverkamp, and David Andreas, respectively, each probed him. He then testified that when Michael Ryan left to find something bigger to use, Tim Haverkamp started probing again, and during that time something had broken inside of James Thimm. He testified his dad then inserted a second object which went in "real easy." He testified he and Tim then asked Yahweh "if James Thimm's bowels were busted," and Yahweh indicated they were. The defendant testified he had previously been told that James Thimm had been informed by Ryan that if he did not straighten up Yahweh would take his life. The defendant testified that during the probing he had gone to find some duct tape and that Ryan put the tape over James Thimm's mouth because the victim had groaned and asked Yahweh to forgive him. He testified that he had not felt sad for James Thimm because the victim had made Yahweh angry.

The defendant then testified that later that afternoon the five men went back to the farrowing house. James Thimm could then talk but could not walk very well. James Thimm was then laid on his belly and whipped 15 lashes by each of the five men. The defendant testified that, at that time, he was told James Thimm would probably die because his bowels had been "busted." The defendant testified he ate supper and slept that night without difficulty.

The next morning the men returned to the farrowing house. James Thimm was dragged from one side of the building to the other by wires around his wrists and was wired to an auger and whipped again. James Thimm was then wired to a pipe on the floor and whipped again. During this time he was undressed except for socks. The defendant testified that the victim first begged Yahweh for forgiveness and then began to lapse into unconsciousness after his fingers were shot. The defendant testified his arm was used by the men during the arm tests that day concerning shooting the victim's fingers and breaking his legs. The defendant testified that at some point during the whippings he had begun to call out the names of the other members of the group while lashing the victim. The defendant testified that after the whipping the five men ate lunch and that Ryan then told them Yahweh had said the victim was to be dead by 6 that night.

When the five returned to the farrowing house, each shot one of the victim's fingers on his left hand. The hand was propped up on a block of wood, palm up. He testified the victim was alive and conscious at that time. The victim was then whipped again, 15 more lashes apiece, twice by each of the five. The defendant then stated that some of the men discussed the possibility of skinning the victim, and the defendant went to get some razor blades. The defendant testified he believed the victim was dead at that time, but that he could not skin the leg very well because his hands kept sweating on the pliers and slipping off. The defendant testified that he and Tim then asked Yahweh if they could break the victim's legs, received an affirmative answer, and then each broke one leg. The defendant stated the body was then placed in a sleeping bag, a grave was dug, and the body was buried. He testified that later that night he, Tim and James Haverkamp, and David Andreas sat around, smoked marijuana, and laughed and talked about the murder. He further testified he had not had nightmares or trouble sleeping since the murder.

The defendant described Tim Haverkamp as a close friend and stated that he got along pretty well with Jim Haverkamp and David Andreas, but described his relationship with James Thimm as less close and that he ultimately disliked Thimm by

February of 1985. The defendant stated he had occasionally verbally abused Thimm. The defendant testified that he once accidentally shot Thimm, when Yahweh had pulled the trigger of his gun, causing a bullet to shoot James Thimm in the cheek. The following day, the defendant testified, he had put a notch on his gun to show that Yahweh had shot someone with it. The defendant also testified that once when Ryan had been gone, in March of 1985, he "grabbed my .45 and shoved it in his [Rick Stice's] face."

The defendant also testified that after the murder he had discussed the option of burning the body to destroy the evidence and had been told to get rid of the shovels, but did not do so even though Yahweh had told them to. The defendant testified, on cross-examination, that he enjoyed life on the farm and was not forced or coerced into participating in Thimm's torture and murder. He also testified he had been aware that Thimm was in pain while being probed.

The defendant testified he began to smoke marijuana late in the summer of 1984. He also testified that once, when Ryan was not on the farm, he, James Haverkamp, and Daniel Haverkamp went to Falls City and drove around drinking beer. When asked if he had ever worn a bulletproof vest and let people shoot at him, the defendant replied, "I wouldn't let it happen to me."

Ryan testified that it was his understanding the defendant had knocked Rick Stice into the front window of the trailer and broken it during Ryan's absence from the farm. He further testified it was the defendant's idea to say the names of the women and children while whipping Thimm.

Tim Haverkamp testified for the State. He testified the defendant was in charge of guard duty on the farm and that after the first of January 1985, the defendant was second in command. He testified that in March 1985 Ryan was gone for 2½ days and the defendant and Tim were left in charge. He testified that during that time the two men had ordered Rick Stice and James Thimm to do extra work around the farm for punishment, including nonstop calisthenics and exercises. He testified that in the evening of the second day of Michael Ryan's absence from the farm, Richard Stice left.

Tim Haverkamp also testified regarding the defendant's shooting of Thimm's cheek. It was his recollection that prior to the incident the defendant had been talking to Thimm, became angered, and said something like, "Well, maybe I ought to just shoot you," and he then turned toward Thimm, aimed, and the gun went off. He also testified the defendant had put a notch on his gun and said it was to show he had shot one person.

Tim Haverkamp's version of the torture was similar to the defendant's in many respects, but differed in others. He testified Thimm was probed with two different shovel handles. Tim Haverkamp further testified Thimm was alive when he, Ryan, and possibly the defendant attempted to skin his leg. Tim Haverkamp testified it was the defendant who asked Ryan to ask Yahweh if he could break one of Thimm's legs and that he and the defendant then each broke one leg. Tim Haverkamp testified that, at this point, Thimm was still alive. He testified that Ryan then kicked Thimm a few times in the head and chest. Tim Haverkamp testified that after being kicked, Thimm was dead. Tim testified that he, Andreas, and the defendant dug the grave. He testified that Ryan placed the body in the grave and that Tim Haverkamp then shot Thimm once in the head, and later Thimm's remaining clothing was burned so that no evidence of Thimm's presence was left on the farm.

On cross-examination Tim Haverkamp testified that Ryan was proud of the defendant and had said the defendant would be his successor. He testified that he had stopped believing in Yahweh several weeks after his arrest and incarceration had separated him from the farm.

James Haverkamp also testified on behalf of the State. He testified that in August 1984 Ryan had announced that Yahweh had confirmed that the defendant was to be considered a man. He stated the defendant had seemed proud of his new status. He testified that at some point in time Rick Stice and James Thimm were demoted to slaves and that during Ryan's absence from the farm, the two "slaves" were ordered to do extra work, were not allowed to sleep, and were made to do calisthenics by the defendant and Tim Haverkamp. He further testified that during this time the defendant verbally abused both of the men and physically abused James Thimm.

He also testified that he saw Thimm's body lying on the floor in the confinement building, legs broken, after one leg had been skinned and that Thimm was then still alive. James testified Thimm was then stomped to death. After they were sure he was dead, James, the defendant, and Tim placed Thimm's body into the sleeping bag. James Haverkamp testified that he was not involved with the burial and that at the time of the murder he believed he was doing the right thing because he believed Yahweh's laws were supreme to all other laws.

David Andreas also testified on behalf of the State. His testimony closely matched James Haverkamp's, and differed from the defendant's testimony in several areas. He testified that when he first moved to the farm he and the defendant shared most of the guard duty, but the defendant's rank was always higher than his own. Andreas testified the defendant was subsequently in charge of Thimm, James Haverkamp, and Andreas; was generally above rank to Tim Haverkamp; relayed messages from his father; performed some guard duty; and was ultimately designated as the high prince in the fall of 1984.

Andreas testified that Stice and Thimm were demoted to slaves in approximately January of 1985. Andreas testified that when Ryan left the farm in March 1985, the defendant was in charge, physically abused Thimm by shoving him into and breaking a window above the sink in the south trailer house, and physically abused Rick Stice. He also testified the defendant forced the two men to stay awake, do calisthenics, and move hay bales from one side of a barn to the other and then back again. Andreas testified the defendant also ordered Thimm to stand up all night on guard as punishment.

Andreas testified Thimm was alive when his fingers were shot. He further stated he had later spoken with the defendant concerning the murder. It was his recollection the defendant thought it was "pretty neat" that someone who was 15 had killed a man. Andreas portrayed the defendant as a loud, obnoxious, boss' son.

Richard Stice testified on the defendant's behalf. Stice corroborated Haverkamp's and Andreas' testimony concerning the defendant's treatment of "the slaves" during Mike Ryan's absence. Stice also testified that during that time

the defendant ordered them to beat their heads against the wall and Stice had refused to do so. James Thimm, however, did follow the orders. It was at that point the defendant pulled a gun, put it against Stice's head, and told him he would blow Stice's head off if Stice refused. He further testified the defendant physically abused both of them by shoving them to the floor. Stice also testified the defendant was involved in the theft of some hogs. Stice testified it was his understanding Thimm was demoted to slave status because he and the defendant could not get along.

Stice testified he was present when the defendant shot Thimm in the cheek. Stice testified the defendant had been verbally abusing Thimm while the defendant was shooting out of the trailer window, turned toward Thimm, said, "I ought to shoot you," pulled the trigger, and shot him. Stice testified he saw the defendant pull the trigger. Stice also testified it was the defendant who suggested that Stice would be made to have sex with a goat unless he followed orders. Stice testified the defendant made hateful remarks to him when Ryan was not around, and would verbally abuse Thimm. It was Stice's opinion the defendant was not dependent on his father to make decisions, and exercised authority on his own.

Ruth Ryan testified on behalf of the defendant. She testified that she had seen the defendant snicker about what had happened to Thimm. Mrs. Ryan also testified that she believed the defendant felt he could communicate with Yahweh through his mind and that she knew the defendant and Tim Haverkamp had been put in charge of the men while Ryan was away from the farm.

Cheryl Gibson testified on behalf of the State. She testified the defendant was rather shook up when he told her Thimm had been shot in the cheek. Ryan had told her the defendant was eager to participate and learn how to torture and abuse a person. The defendant had appeared happy about how things had gone the day of the murder, and both defendant and Ryan had laughed and joked about Thimm's death. Gibson testified that the defendant was in charge of the men when his father left the farm, and she had heard Ryan tell Tim and the defendant they were in charge and to treat Stice and Thimm decently while

he was gone. When Ryan returned and learned how the men had been treated, he told the defendant, "I told you not to do that, but Yahweh is not mad at you, so that's okay."

John Dietrich, a criminologist for the Nebraska State Patrol, testified two shovels had been found which had greasy debris on the ends. Betty Jane Khreiss, a forensic serologist for the Nebraska State Patrol, testified she compared the hairs taken from the shovels with a sample taken from James Thimm and concluded they matched.

Jerry D. Rader testified he had been incarcerated for a time with Ryan, who told him that in the event he could not "carry out his role as the leader, his son was fully capable of following in his footsteps and would do so." He further testified Ryan had told him the defendant was his "right-hand man."

At sentencing the trial court stated that in sentencing the defendant the gravity of the offense could not be overlooked. The court stated that "[h]aving regard for the nature and the circumstance of this crime, and the history, character, and condition of this defendant, the Court finds that imprisonment of the defendant is necessary for the protection of the public for the following reasons." These reasons included that there was a risk the defendant would engage in future misconduct, that a lesser sentence would depreciate the seriousness of the crime and promote disrespect for the law, that the defendant required correctional treatment which could most effectively be provided by commitment, and that the court had considered and weighed the various grounds set forth in Neb. Rev. Stat. § 29-2260 (Reissue 1985) and had found no justification for withholding sentence or granting probation.

The evidence presented illustrated the defendant's participation in the daily life on the farm, his independent abuse of the victim prior to the murder, and his willing and enthusiastic participation in the murder. The defendant understood the nature of his participation in the murder. Further, all of the expert witnesses agreed the defendant's rehabilitation would require some length of time and was somewhat dependent upon support from Ryan. The trial court considered all of the relevant facts of the case before imposing sentence on the defendant. We find there was no abuse of

discretion in imposing the maximum sentence permitted by statute.

The judgment is affirmed.

AFFIRMED.